People v V.R. (2024 NY Slip Op 50702(U))

[*1]

People v V.R.

2024 NY Slip Op 50702(U)

Decided on May 13, 2024

County Court, Erie County

Barnes, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on May 13, 2024
County Court, Erie County

The People of the State of New York,

against
V.R., Defendant

Indictment No. 01713-2018

HON. JOHN J. FLYNN
Erie County District Attorney
Mindy VanLeuvan, ADA 
THE LEGAL AID BUREAU OF BUFFALO
Abigail Whipple, Esq. and Kerry Conner, Esq.
Attorneys on behalf of Defendant

Suzanne Maxwell Barnes, J.

On January 11, 2023, Defendant moved pursuant to CPL 440.10(1)(h) for an order vacating her judgment in the above-entitled matter convicting her upon a plea of guilty to Attempted Murder in the Second Degree (Penal Law §§ 125.25[1], 110.00, 20.00) and Tampering with Physical Evidence (Penal Law § 215.40). She simultaneously moved to have her sentence modified pursuant to the Domestic Violence Survivors Justice Act ("DVSJA"; CPL 440.47). This Court previously determined that Defendant's application for resentencing satisfied the requirements under CPL 440.47.
On February 19, 2024, this Court allowed Defendant to amend the motion to vacate judgment (CPL 440.10) and convert to a motion to set aside the sentence (CPL 440.20), while maintaining the motion for resentencing pursuant to CPL 440.47 under the provisions of Penal Law § 60.12. The parties submitted supplemental affidavits, and a hearing pursuant to CPL 440.47 was held on April 19, 2024. No witnesses were called by either side. On consent, People's Exhibit A and Defendant's 1 (Exhibits A-AI) were received into evidence. Over the People's objection, this Court received Defendant's 2. The Court heard oral argument, and allowed both parties to provide post-hearing submissions prior to this Decision.
FINDINGS OF FACT
On February 11, 2019, Defendant pleaded guilty to Attempted Murder in violation of [*2]Penal Law Sections 125.25(1), 110.00, 20.00 and Tampering with Physical Evidence in violation of Penal Law Section 215.40. With respect to the attempted murder charge, her co-conspirator, L.P., Defendant's cousin, died from wounds inflicted by the intended victim, J.H., Defendant's boyfriend at the time of the crime. With respect to the tampering charge, Defendant admitted that she removed the security camera from the home to conceal her participation in the crime.
Procedural History
Notably, at the time Defendant entered her guilty plea (February 11, 2019), the subsequently-enacted provisions of both CPL 440.47 and Penal Law § 60.12 were not yet in effect. By the time of Defendant's sentencing (June 17, 2019), the new provisions of Penal Law § 60.12 were in effect (as of May 14, 2019), albeit without the knowledge of Defendant's attorney.[FN1]
 CPL 440.47 took effect approximately two months after Defendant's sentencing (August 12, 2019).
Domestic Violence History
Defendant described meeting J.H. when he was 17 years old and she was 14 years old (Defendant's 1: Exhibit A). They dated briefly. A romantic relationship did not resume until 2012, when J.H. was released from a federal penitentiary after his conviction in Federal Court for a drug-related offense, Conspiracy to Distribute and Possess with Intent to Distribute 50 grams or more of cocaine base, in violation of 21 U.S.C.A. § 846 (Defendant's 1: Exhibit W). Defendant described the relationship as good, initially, until May of 2016 (Defendant's 1: Exhibit A). Defendant alleged that from that time forward, the relationship deteriorated.
In May of 2016, J.H. was a suspect in a "shots fired" call at 198 Prospect in Buffalo, New York, the residence of the paternal grandmother (surname "M") of Defendant's youngest child (Defendant's 1: Exhibits A, X). Four bullet casings were recovered at the scene; one bullet was recovered inside the residence, and one bullet was recovered underneath a vehicle at the residence (Defendant's 1: Exhibit X). This incident allegedly resulted from an underlying conflict between J.H. and the father of Defendant's youngest child and her uncle, Y.M. (Defendant's 1: Exhibits A, X). J.H. believed that the Y.M.'s daughter, N., had been a "snitch" against J.H.'s brother, one of the co-defendants in the aforementioned drug case. According to Defendant, there were frequent altercations between the uncle and J.H. (Defendant's 1: Exhibit A).
The day before the shooting incident, there was a fight between members of the M. and H. families (Defendant's 1: Exhibits A, X). It is noted that J.H. was arrested in 2019 and subsequently convicted of Assault in the Third Degree against victim Y.M. An Order of Protection on behalf of the victim remains in effect through June of 2027 (public record).
Around the time of the shooting incident, J.H. was injured at work and receiving Worker's Compensation benefits. J.H. was using hydrocodone and muscle relaxers for arthritis and pain, causing him to gain significant weight and increase his irritability, which escalated his [*3]verbal tirades against Defendant, including, "You look like a man," "ho," "bitch," and "you are ugly" (Defendant's 1: Exhibits A, Y). J.H. put Defendant in a subservient position, forced her to refer to J.H. as "master," and frequently told her to "get a rope and hang herself" (Defendant's 1: Exhibit A). Other psychological abuse involved preventing her from sleeping by making loud noises and threatening her with different knives while detailing how he would use them on her. J.H. showed Defendant his gun on multiple occasions, and once drove by her while she was driving and made a shooting gesture with his hand. He frequently accused her falsely of cheating. Defendant submitted to a fidelity lie detector test to appease J.H.'s claims of her infidelity during 2016 and 2017 for the periods of separation when she left him (Defendant's 1: Exhibit A). Defendant claimed she left J.H. five times over the course of two-and-one-half years.
Both former defense attorneys advised the court and District Attorney's Office of domestic violence issues, as further described by friends and family (Defendant's 1: Exhibits J, S, Y). Attorney Runfola further outlined the horrifying abuse Defendant claimed she suffered at the hands of J.H. in advance of the plea (Defendant's 1: Exhibit J). This included unwanted, painful anal sex and unwanted oral sex which caused Defendant to gag and gasp for air (Defendant's 1: Exhibits A, J, Y). Defendant described other physical abuse that included having her face shoved into a wall, being dragged by her hair and arm, and being choked during sex. Defendant described J.H.'s hair-trigger temper that caused her to always be "wired" (Defendant's 1: Exhibits A, J, Y).
Defendant also painted a history of financial and emotional abuse exacted by J.H. upon her. J.H. demanded her paycheck so he could have complete control over the finances (Defendant's 1: Exhibits A, Y). J.H. frequently locked Defendant out of the apartment they shared, leaving her without clothes and other personal items. Other times, he locked Defendant out of the bedroom or J.H. locked up the television, so she could not watch it.
Defendant filed a police report on September 11, 2016 alleging that during a dispute on August 5, 2016 with J.H., he threatened to stab her, stating, "Bitch, I will stab you and make it look like you did it yourself" (Defendant's 1: Exhibits A, J, R, Y). J.H. made this threat in response to Defendant attempting to stand up for herself during a verbal and physical tirade. J.H. unleashed his furor because Defendant had neglected to timely pay the electric bill. After this altercation, Defendant moved out for approximately three months and lived with her son (Defendant's 1: Exhibits A, J).
After filing the police report, Defendant contacted J.H.'s parole officer who directed her to the Family Justice Center (Defendant's 1: Exhibits A, J, R, AA). Defendant claimed she went to the Family Justice Center a few times, but by the time she was actually ready to file a report against J.H., she was denied an Order of Protection as the incident had occurred two months previously. According to Defendant's aunt, J.P., and her cousin, R.P., Defendant complained about J.H. never being penalized for his parole violations (Defendant's 1: Exhibits A, S, U). 
Defendant again returned to J.H. some time around Thanksgiving 2016 based on his promise that things would be different. This reunion was brief and Defendant left J.H. in January of 2017, choosing not to expose her daughter and grandson to the violence in the home (Defendant's 1: Exhibit A). 
Defendant's daughter, A.M., lived with Defendant and J.H. from ages 16 through 18. She witnessed J.H.'s verbal diatribes, including use of the words "cunt," "fucking bitch," "whore," [*4]and "slut," and constant insults regarding Defendant's weight (Defendant's 1: Exhibit A). 
On March 3, 2017, Defendant filed another police report. Defendant was still not living with J.H. at the time. By way of background, on December 12, 2016, J.H. served a small claims action upon Defendant for monies he claimed were owed for rent and a down payment on the vehicle Defendant drove but was titled and registered to J.H. (Defendant's 1: Exhibits A, Z). The receipt for the vehicle down payment was put in J.H.'s name despite Defendant's financial contribution. Defendant claimed that J.H. only withdrew this action by not appearing on the date of the scheduled trial (June 14, 2017) when Defendant agreed to 'return' to him (Defendant's 1: Exhibit A). Defendant returned to J.H. after he again made promises, did things to please her, including making repairs to the home and painting it in colors she liked.
Before the small claims action was dismissed, Defendant claimed that J.H. engaged in harassing and stalking behaviors regarding this litigation, including sending her letters and driving by her son's home or her employment two to three times per week (Defendant's 1: Exhibits R, Z). At times, J.H. would send Defendant a picture of her car, so she would know she was being watched. Per the March 2017 police report, Defendant sought an Order of Protection after J.H., using an acquaintance, slipped a letter under the door at Defendant's place of employment. Although the contents of the letter were not disclosed, this Court finds Defendant's fearful alarm from the workplace contact, plus the request for an Order of Protection referenced in the police report, very revealing as to Defendant's state of mind concerning the actions of J.H. (Defendant's 1: Exhibits Q, R).
With respect to this vehicle, another time, while the Defendant was at work, J.H. caused the removal of the vehicle's license plates rendering it illegal to operate (Defendant's 1: Exhibits A, J). Defendant used this vehicle for transportation and it was parked at her place of employment at the time. Defendant later viewed the parking lot video footage and observed Defendant standing next to the vehicle with another individual removing the plates. Another time, J.H. canceled the car insurance Defendant had prepaid and kept the refund (Defendant's 1: Exhibits A, J). 
Defendant's situation spiraled and by the summer of 2018, she attempted suicide through an overdose of hydrocodone and sleeping pills (Defendant's 1: Exhibits A, J, S, T). During summer 2018, Defendant also reconnected with her cousin, L.P., the co-conspirator in the underlying matter . He noticed the changes in her disposition, and in late August, while giving him a ride, he noticed bruises on her thighs. After some prodding, Defendant unburdened herself and shared her torment with her cousin. L.P. volunteered to "take care of it," and thus, the events leading to his death unfolded (Defendant's 1: Exhibits A, J, S, T, U; People's Exhibit A).
In advance of the crime, and in preparation of the intended crime, text messages were exchanged between Defendant and L.P. starting September 3, 2018, including a message from Defendant stating, "Don't forget me I cant deal anymore" (Defendant's 1: Exhibits A, J, T; People's Exhibit A). On the date of the crime, Defendant made an unsolicited statement to Detective Christopher Sterlace before she was even Mirandized, let alone arrested: "I know I'm in trouble, but I just couldn't take the abuse anymore" (People's Exhibit A).
Defendant, in her written statement to the original sentencing court dated February 11, 2019 (Defendant's 1: Exhibit P), advised that she was fooled many times into returning to J.H. Defendant's cousin, R.P., confirmed in her letter to the sentencing court dated November 8, 2018 [*5]and affidavit dated May 11, 2022 (Defendant's 1: Exhibits S, U), that "for weeks at a time [] she came to live with me because he would 'threaten her.'" R.P. relayed that Defendant stayed with her on two occasions in 2018, including two to three weeks before the crime date. She also relayed that Defendant played a "chilling recording" from her phone of J.H. telling Defendant that he would make her "disappear," describing it not as a "threat" but a "promise." This phone was apparently seized, but neither Defendant, nor the People have provided any further information regarding the whereabouts of this recording. R.P. referenced a previous denial of an Order of Protection for Defendant, and countless nights spent crying with Defendant trying to figure out a way for Defendant to escape J.H. "for good" (Defendant's 1: Exhibits S, U). Defendant and other family members attribute various health issues — physical and otherwise — due to J.H.'s mistreatment of Defendant during their relationship (Defendant's 1: Exhibits A, S).
Personal History/Character
Defendant, currently age 52, also experienced a childhood riddled with trauma. She was raised by her maternal grandparents until age 14. She described her mother and her maternal grandfather as alcoholics. She witnessed significant physical and emotional abuse exacted by her grandfather against her grandmother, and personally experienced his rage during her childhood when her grandfather badly beat her. She claimed that she was sexually abused by an uncle and two cousins. On the date of the crime, Defendant advised that she was triggered and recalled a flashback image of her uncle and two cousins with a knife at her vagina (Defendant's 1: Exhibits A, J, S, T).
At age 14, when she returned to live with her mother, Defendant indicated that she "was really on my own," recalling no family structure such as mealtimes or bedtimes. At age 18, she became pregnant with her first child. Defendant now has three adult children and two grandchildren. Defendant claimed to maintain good relationships with both fathers of her children. Defendant supported herself and her children with employment with the public school system for 20 years preceding this offense. Defendant was described by numerous family members and co-workers as kind and caring, with empathy for others, particularly her family (Defendant's 1: Exhibits A, J, S, T). 
While institutionalized, Defendant was diagnosed with post-traumatic stress disorder and adjustment disorder with anxiety and depression. Defendant was accepted into the Puppies Behind Bars program while incarcerated. She was awarded a Certificate of Occupational Training animal Caretaker for the completion of "an eighteen-month course in animal care, handling and training, specifically as it relates to the raising of potential Explosive detection canines and service dogs for the disabled," and in particular, helped raise R., who is currently serving as a service dog (Defendant's 1: AC-AF).
Defendant articulated that her relationship with her children and even her mother have greatly improved despite her incarceration since J.H. is no longer part of her life. Defendant hopes to help other domestic violence survivors upon her release (Defendant's 1: Exhibits J, P, S).

CONCLUSIONS OF LAW
 
 Legal Analysis 

In order to obtain relief under the DVSJA, this Court must first determine whether Defendant's abuse was a significant contributing factor to her criminal behavior. "A court's evaluation with regard to whether the abuse a defendant suffered constitutes a significant contributing factor to her criminal behavior is not transactional. It is cumulative, requiring the court to consider the cumulative effect of the abuse together with the events immediately surrounding the crime, paying particular attention to the circumstances under which defendant was living and adopting a 'full picture' approach in its review" (People v Smith, 69 Misc 3d 1030, 1038 [Erie County Court 2020], citing NY Senate, Regular Session, March 12, 2019, at 1569-1572).
This Court must answer the following questions presented under Penal Law § 60.12(1): (a) was Defendant, at the time of the instant offense, a victim of domestic violence subjected to substantial physical, sexual or psychological abuse by a member of the same family or household as the defendant as such term is defined in subdivision one of section 530.11 of the criminal procedure law; and (b), was such abuse was a significant contributing factor to the defendant's criminal behavior.
The People continue to argue that Defendant has not fulfilled the requirements to obtain a hearing. They additionally argue that Defendant has failed to provide any corroborating evidence, such that this application is merely a series of self-serving statements by Defendant and ask that the instant relief be denied. 
Initially, in the underlying criminal prosecution, Defendant was represented by an attorney, Andrew Tabashneck, who was subsequently indicted on one count of Witness Tampering in the Fourth Degree (Penal Law § 215.10). The People minimize the value of the letters proffered by this attorney in support of Defendant for a bail hearing since most are typed and not notarized, implicitly arguing that the taint of the former attorney's criminal action somehow are imbued in these letters making them unworthy of consideration. This Court notes that rarely, if ever, is a letter in support of a defendant notarized.
The People further argue that the police reports cannot be introduced in support of Defendant's position as it is not "documentation prepared at or near the time of the commission of the offense" (see CPL 440.47[c]). This argument ignores the proof presented that the domestic violence perpetrated upon Defendant by J.H. was a continuing course of conduct from 2016 through and including the date of the underlying crime. 
At the time of sentencing, Defendant's attorney, countering that Defendant's guilty plea was "a strategic move", asked the Court what "...at the age of 47... would make somebody who's never had a criminal conviction before wind up in this situation to where she pled guilty to an attempted murder charge? ... Being in a domestic violence relationship, the amount of fear, control, and power that the abuser has over the individual that they are inflicting the abuse on is overwhelming. My client felt she did not have a way to get out, a safe way to get out" (Defendant's 1: Exhibit O). 
The People and Defendant surmise differently; yet, the question remains unanswered by the People. Defendant asserts the crime was arranged and committed in response to the years of abuse, including physical, sexual, and psychological abuse, perpetrated by J.H. upon Defendant. Contrary to the People's assertions, Defendant has consistently raised the specter that domestic violence was the basis of the crime — from her text message before the crime to her cousin, "Don't forget me I cant deal anymore"; to her nearly immediate confession, "I'm in trouble but I [*6]just couldn't take the abuse anymore"; and attorney Runfola advising the Court and counsel, well in advance of a plea, of issues related to the substantial domestic violence to which Defendant had been subjected (Defendant's 1; People's Exhibit A).
Prior to the plea, given attorney Tabashneck's legal troubles, the Court inquired whether Defendant sought to obtain another attorney. Defendant responded, "[former counsel] did make me aware of that, actually considering seeking new counsel, but I didn't want to bring his business into the courtroom" (Defendant's 1: Exhibit G). Defendant, charged with attempted murder and the ramifications associated therewith, did not want to make someone else's transgressions a topic in the open courtroom. This speaks volumes to the Court regarding the ability, or lack thereof, to articulate her needs in public. 
Although the People demand more obvious, direct connections of abuse, as is well known by now, domestic violence is an ugliness that lurks in the shadows of everyday life. CPL 440.47 specifically seeks to address the inequities that arise within the confines of a criminal prosecution threaded with a backdrop of domestic violence. A hearing pursuant to this statute gives the abused victim a platform to shed light and add clarity to events that shaped the subsequent tragedy.
Based upon the evidence presented, this Court, by a preponderance of the evidence, does answer the posed questions (a) and (b) in the affirmative.
Lastly, this Court must answer the following question presented under Penal Law § 60.12(1)(c) having regard for the nature and circumstances of the crime and the history, character and condition of the defendant, that a sentence of imprisonment pursuant to section 70.00, 70.02, 70.06 or subdivision two or three of section 70.71 of this title would be unduly harsh may instead impose a sentence in accordance with this section.
The Court is disturbed by Defendant's text message on the date of the underlying crime, "do him first in case he wakes up." Defendant has consistently maintained that the intent was assault, only: "I just wanted my cousin to kick his ass so that he would stop abusing me" (Defendant's 1: Exhibit Y). This Court has considered the possibility that Defendant's true intent was to commit murder; however, this does not change the lens of this Court. 
It is noted that Defendant did admit her guilt by pleading guilty to attempted murder. Her own letter to the sentencing court states that she, "made a bad decision which escalated into a HORRIBLE, UNINTENDED result" (Defendant's 1: Exhibit P [emphasis in original]). Evidence demonstrated that this crime was planned at least three days in advance and that Defendant facilitated her co-conspirator's entry into the home. There is no proof in the record that Defendant concocted the plan, as the People argue (People's Exhibit A). Although Defendant initially lied to the police about what had transpired, later that same day, Defendant volunteered that the missing surveillance equipment was in her car. Notably, she stated, "I'm ready to deal with the consequences" (Defendant's 1: Exhibit P; People's Exhibit A).
By the time Defendant entered her plea of guilty to counts one and three of the Indictment on February 11, 2019, Defendant was repeatedly advised that her sentence would be capped at a determinate sentence of nine years (Defendant's 1: Exhibits A, K, L). In other words, nine years was Defendant's maximum exposure. At the time of the plea, the People acknowledged that defense counsel would be allowed "to submit some materials with regard to mitigation," and the court stated it would "consider" arguments from Defendant's attorney "in regard to mitigation whether or not the domestic violence mitigating circumstances should be employed with regard [*7]to the sentencing parameters" (Defendant's 1: Exhibit L).
The People argue that Defendant already secured a favorable sentence and should not receive two bites at the apple. The Court disagrees with the People's claim that "Judge Case's sentence is essentially law of the case which should be deemed the equivalent of res judicata, as it was founded on a review of the evidence presented to him to address any mitigating factors regarding domestic violence in sentencing the defendant." The sentencing court initially acknowledged that "the issues that have been raised in the pre-sentence report and in the submissions that I received require me to have a hearing (Defendant's 1: Exhibit M [emphasis added]). Thereafter, upon a cautionary discussion between the People, defense counsel, and the sentencing court warning it might disregard the sentencing parameters agreed to at the time of the plea, it appears that defense counsel felt compelled to withdraw her request for a CPL 60.12 hearing (Defendant's 1: Exhibit N). Thus, the court did not conduct a hearing pursuant to Penal Law § 60.12, leaving it to this Court's province to make a determination.
It is clear that the sentencing court did not have the full, complete history of domestic violence perpetrated by J.H. upon Defendant. What Defendant secured at the time of the plea was a commitment to concurrent sentencing with a cap of nine years with the possibility of a lower sentence, without hearing all the "mitigating factors" of domestic violence suffered by Defendant (Defendant's 1: Exhibits K, L, M).
At the time of this CPL 440.47 hearing, the People were unsure whether the police reports were submitted to the sentencing judge. This Court notes that the letter to the Court dated February 1, 2019 submitted by attorney Runfola referenced a police report made by Defendant "in or around July/August 2016," but the sentencing court never received the report, nor reviewed its contents. It is clear now that the sentencing court was unaware there were actually two documented police reports, and was unaware of financial blackmail placed upon Defendant regarding a vehicle she utilized for employment transportation, such that no consideration was given to the full history in meting out the nine year determinate sentence followed by five years of post-release supervision.
Due to the timing of Defendant's plea and postponed sentencing, both the original sentencing court and the People provided inaccurate representation of Defendant's incarceration exposure under either Penal Law § 60.12, in essence discouraging Defendant from presenting a complete history of her domestic violence to maintain the original parameters agreed to at the time of the plea. Considering Defendant's unblemished criminal history preceding this crime, the wealth of character evidence presented corroborating details of Defendant's domestic violence, and her impressive institutional record, I find that the imposed sentence was unduly harsh and severe. 
Thus, this Court, by a preponderance of the evidence, answers question (c) in the affirmative, that Defendant's originally imposed sentence is unduly harsh.
NOW, THEREFORE, upon reading and having considered the notice of motion and supporting affidavits of counsel for Defendant sworn to on January 11, 2023, June 7, 2023, March 5, 2024, April 2, 2024, and April 25, 2024; and the opposing affidavits of the People, dated May 19, 2023, March 19, 2024, March 20, 2024, and May 3, 2024; a hearing held and exhibits entered; and due deliberation having been had thereon; it is hereby
ORDERED, that Defendant should be resentenced in accordance with Penal Law § [*8]60.12; and it is further
ORDERED, that upon resentencing, a determinate sentence of five years' imprisonment together with a five-year period of post-release supervision would be imposed on Defendant's conviction for Attempted Murder in the Second Degree (Penal Law §§ 125.25[1], 110.00, 20.00), and a definite sentence of one year imprisonment on Defendant's conviction for Tampering with Physical Evidence (Penal Law § 215.40), all such sentences to run concurrently with each other; and it is further
ORDERED, that Defendant has ten days from the date of the within Memorandum and Order to inform the Court whether she wishes to withdraw her application or appeal said Memorandum and Order; and it is further
ORDERED, that unless Defendant so advises the Court with said ten-day period, the matter will be set down for resentencing on May 24, 2024 at 10:00 A.M., at which time the Court will vacate the sentence originally imposed and impose a determinate sentence of five years' imprisonment together with a five-year period of post-release supervision would be imposed on Defendant's conviction for Attempted Murder in the Second Degree (Penal Law §§ 125.25[1], 110.00, 20.00), and a definite sentence of one year imprisonment on Defendant's conviction for Tampering with Physical Evidence (Penal Law § 215.40), all such sentences to run concurrently with each other; and it is further
ORDERED that Defendant shall appear with counsel on May 24, 2024 at 10:00 A.M. for the purpose of resentencing.
__________________________________
HON. SUZANNE MAXWELL BARNES
Erie County Court Judge
DATED: May 13, 2024
Buffalo, New York

Footnotes

Footnote 1: Compare Affidavit of Attorney Jennifer Runfola dated April 19, 2023 included as People's Exhibit A to their Opposing Affidavit dated May 19, 2023, with explanatory email from the People dated March 27, 2024, attached as Court Addendum.